THE PEOPLE OF THE STATE OF NEW YORK ex rel. JESSIE CHALMERS HAGY, Individually and as Executrix, etc., of ROBERT M. CHALMERS, Deceased, Relator, Respondent, *v.* RICHARD J. LEWIS, as Commissioner of Assessments of the City of Albany, N. Y., and Others, Appellants. (Assessment of 1937, 37 North Pearl Street.)

Hill, P. J., Rhodes and Heffernan, JJ., concur; McNamee and Bliss, JJ., dissent, McNamee, J., with an opinion, in which Bliss, J., concurs, except as to the method of fixing the rate of equalization.

McNAMEE, J. (dissenting). The property in question is known as 37 North Pearl street in the city of Albany, with a frontage on North Pearl street of about twenty-five feet and an extension back about one hundred and forty-one feet, and with an entrance into another store building on Maiden lane. It is located in the most important and valuable business block in the city of Albany, and adjoins the property commonly known as the John G. Myers Department Store. It was assessed in 1937 for $312,000. In her written protest to the board of tax review the relator stated that the property was worth only $100,000.

Following the recommendations of the referee, the Special Term reduced the value by $152,000, found the general assessed value of the city to be sixty-four per cent of the true value, and for that reason reduced the assessment further by $57,600, and found the assessed value of the property to be $160,000. In my judgment there are two challenging errors here, viz., the one shown by the valuation as found, and the other as shown by the rate of sixty-four per cent at which property was found to be assessed in the city of Albany.

To support her protest and to secure the reduction obtained, the relator offered the evidence of two witnesses, one of whom stated the market value to be $143,130, and the other $142,008.55, and each of these witnesses testified that the fair rental value of the property was $15,000 a year, despite the fact that one of them said

he knew that the principal floor and basement of the property in question were then rented under a ten-year lease for $22,500 a year, and the other that he knew the property was yielding a yearly rent of at least $24,500. One of these witnesses explained the rental value as stated by them by saying that there was a business spurt on Pearl street between December, 1936, and June, 1937, when "prices of merchandise were rising rapidly," and there was then a great demand for stores in that block, although he admitted on cross-examination this increased value had continued up to the time of trial, in May, 1938. He further explained these opinions as to the value of the present lease by stating that it was "insecure," but that the agreed rent was still being paid. That was in substance the evidence of the relator on those questions.

The relator also offered a witness who was the president of the John G. Myers Company, a tenant occupying part of the property in question, and the attorney in this proceeding for the relator, who was the majority stockholder of the John G. Myers Company. This witness testified that in the year 1937 the income from this property was $14,024, and the expenses thereof $15,644.80, and that, accordingly, the owner suffered a loss of $1,620.

The city put in evidence its Exhibit G, dated December 15, 1936, which was an application in writing made by the relator to the New York Life Insurance Company, seeking a loan by way of mortgage of $120,000 on 37 North Pearl street and the smaller connecting property on Maiden lane. The application was signed by the relator, and therein it was stated that the value of the ground was $300,000, the buildings $70,000, in all $370,000; that the buildings were insured for $100,000, and the actual income was $19,000 for 1936, and that this income could be increased "materially." Evidently it was increased materially in the early part of the year 1937, by the lease hereinafter referred to. The loan was obtained, and the mortgage was delivered to the insurance company. It appears that the Maiden lane parcel was about one-third of the total land, but not comparable in value, and that the building thereon was worth about $15,000.

There was put in evidence also a lease of the *main floor* and *basement* of the premises in question, dated February 26, 1937, which was to run for ten years from March 31, 1937, and the annual rent reserve therein for that part was $22,500. And in addition to this annual rent, the lease provided that the tenant was to make all interior repairs and structural replacements at its own expense, and that the lease should not take precedence over mortgages to be placed on the property up to $180,000, thus enabling the relator to add additional mortgage liens up to $60,000 over the insurance company mortgage.

After the delivery of the lease and before July 1, 1937, the tenant spent under the lease for improvements on the property, as testified by relator's witnesses, the sum of $39,571. Thus the owner was to receive under this lease $22,500 per year in cash, and prorated improvements for ten years amounting to $3,957 per year. A disinterested witness, the real estate officer of the National Savings Bank of Albany, testified that a fair rental for the upper floors occupied by the John G. Myers Company and a small part of the building which connected it with the Maiden lane property, was $6,500 a year. Accordingly, it was shown by the main lease, an apportionment of the repairs, and the rent that the Myers Company should pay, an annual income of $32,957, or practically $33,000 a year.

The owner was relieved of the burden of interior repairs for ten years to come, and was called upon to pay only her taxes, insurance, and some possible external

repairs on the side walls and roof. This gross income of $33,000 a year, when capitalized under these conditions at eight per cent, would indicate a reasonable value of $425,000.

It seems to me that the character of the testimony offered by the relator as to the value of her property at 37 North Pearl street is in no small way illustrated by two of her witnesses who gave evidence, one of whom said the building could be reconstructed new, as it was on July 1, 1937, for $42,500, and the other, that it could be reconstructed new for $36,263.50, despite the fact that the foundations, the main walls, and the roof were not rebuilt in the repairs for which the tenant paid nearly $40,000. The only deduction to be drawn from the testimony of these witnesses was that the foundation walls one hundred and forty-one feet long and twenty-five feet wide, with corresponding side walls, and a roof, could be reconstructed new, together with the improvements made by the tenant, as one witness put it, for about $3,000 more than the tenant paid for repairs, and as the other one put it, for about $3.000 less. I regard this testimony not only as not overcoming the presumption in favor of the assessment, but as incredible.

In my judgment the method used by the Special Term to determine the percentage of full value at which property in Albany was generally assessed was mathematically wrong. Six sample parcels were selected by each of the parties. The Special Term divided the sum of all of the assessed values by the sum of all of the full values as found, and thus determined that property generally in Albany was assessed at sixty-four per cent of its full value. The *percentage* of full value at which property is assessed may not be determined that way in a tax case, as a matter of arithmetic.

The Special Term should have found the rate or percentage at which *each* parcel was assessed as compared with its full value. The sum of these *rates* or *percentages* should then have been divided by the number of parcels. It is only in this way that the *average rate* or percentage at which property in the tax district, as compared with its full value, may be determined.

When following the method pursued by the Special Term it is found that the assessed values are about sixty-four per cent of full values; whereas, when the *varying rates* of the individual assessments to the individual full values are found, and these made the basis of computation, will the average rate or percentage of undervaluation be made to appear. The application of these two methods produces a difference, in this case, of about sixteen per cent. Clearly one method is wrong. In the one case lump sum assessments and lump sum values are made the basis of computation; in the other, only the percentages of the individual parcels are made the basis for the final average.

If we are to give consideration to the unquestioned rule that an assessment regularly made is presumed to be correct until it is established by the taxpayer to be wrong, the relator is entitled to no relief for overvaluation upon the evidence contained in this record. Not only was the presumption not overcome, but the credible and dependable evidence supports the assessment. With nearly $40,000 spent on the property by the tenant in 1937, and upkeep in the main assumed by the tenant; with the owner relieved of carrying charges, except for taxes, insurance and repairs to the side walls and roof for ten years to come, eight per cent would be a fair return on the investment. On this basis the property has a value of $425,000. This amount, reduced to eighty per cent by a sound computation of assessment generally in the city, would leave an assessed value of $340,000.

We are considering the value of business property in the choicest business location in Albany. The obligation of repair rests in the main on the tenant. The gross income is more than twenty and one-half per cent of the full value as found by the Special Term. This finding is unreasonable as against the taxing authority.

The order and judgment of the Special Term should be reversed, and the assessment confirmed.

Bliss, J., concurs, except as to the method of fixing the rate of equalization.